Carolyn H. Cottrell (SBN 166977)
David C. Leimbach (SBN 265409)
Scott L. Gordon (SBN 319872)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
ccottrell@schneiderwallace.com
dleimbach@schneiderwallace.com
sgordon@schneiderwallace.com

*[Additional Counsel Listed on Next Page]*

Attorneys for Plaintiffs and the Collective
and Putative Classes

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VLADIMIR AMARAUT, *et al.* on behalf of themselves and all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>SPRINT/UNITED MANAGEMENT COMPANY,<br><br>　　　　　Defendant. | Case No. 3:19-cv-00411-WQH-AHG<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT**<br><br>Hearing Date: February 16, 2021<br><br>NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT<br><br>Judge: Hon. William Q. Hayes<br><br>Date action filed: February 28, 2019 |

Gregg I. Shavitz (*pro hac vice*)
Michael Palitz (*pro hac vice*)
Tamra C. Givens (*pro hac vice*)
**SHAVITZ LAW GROUP, P.A.**
951 Yamato Road, Suite 285
Boca Raton, Florida 33431
Telephone: (800) 616-4000
Facsimile: (561) 447-8831
gshavitz@shavitzlaw.com
tgivens@shavitzlaw.com
mpalitz@shavitzlaw.com

Attorneys for Plaintiffs and the
Collective and Putative Classes

# **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................... 1

II.     FACTUAL BACKGROUND ................................................................................... 2

III.    PROCEDURAL HISTORY ...................................................................................... 3

      A.      Plaintiffs' Claims ......................................................................................... 3

      B.      Initial Agreement to Mediation..................................................................... 4

      C.      FLSA Conditional Certification..................................................................... 5

      D.      Plaintiffs' Motion for Additional FLSA Notice ........................................... 7

      E.      Discovery ...................................................................................................... 9

      F.      Mandatory Settlement Conference and Mediation ..................................... 11

IV.     TERMS OF THE SETTLEMENT .......................................................................... 12

      A.      Basic Terms and Value of the Settlement.................................................... 12

      B.      Class and Collective Definitions.................................................................. 16

      C.      Allocation and Awards ................................................................................ 16

      D.      Scope of Release .......................................................................................... 18

      E.      Settlement Administration ........................................................................... 19

V.      ARGUMENT .......................................................................................................... 20

      A.      The Court Should Grant Preliminary Approval of the Settlement as to the
           Arizona, Colorado, New York, Ohio, and Washington Classes and Approval of
           the Settlement as to the Collective............................................................... 20

      B.      The Court Should Conditionally Certify the Arizona, Colorado, New York, Ohio,
           and Washington Classes. ............................................................................ 21

           1.      The Classes are numerous and ascertainable. ................................22

           2.      Plaintiffs' claims raise common issues of fact or law....................22

           3.      Plaintiffs' claims are typical of the claims of the Classes. ...........23

           4.      Plaintiffs and Class Counsel will adequately represent the Classes. ...........24

           5.      The Rule 23(b)(3) requirements for class certification are also met. ...........24

      C.      The Settlement Should Be Preliminarily Approved as to the Classes and
           Approved as to the Collective Because It Is Fair, Reasonable, and Adequate..... 26

i

PLAINTIFFS' MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE
ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

1          1.    The terms of the Settlement are fair, reasonable, and adequate...................27

2          2.    The Parties have agreed to distribute settlement proceeds tailored to the Classes and Collective and their respective claims.....................................28

3          3.    The extensive discovery enabled the Parties to make informed decisions regarding settlement.......................................................................................28

5          4.    Litigating the Lawsuit not only would delay recovery, but would be expensive, time consuming, and involve substantial risk. ............................29

7          5.    The Settlement is the product of informed, non-collusive, and arm's-length negotiations between experienced counsel. ...................................................32

8     D.    The Class Representative Enhancement Payments are Reasonable. ....................32

9     E.    The Requested Attorneys' Fees and Costs are Reasonable. .................................33

10     F.    The Proposed Notices of Settlement and Claims Process Are Reasonable. .........36

11     G.    The Court Should Approve the Proposed Schedule. .............................................38

12  VI.     CONCLUSION .........................................................................................................40

# **TABLE OF AUTHORITIES**

**Federal Cases**

*Amchem Prod., Inc. v. Windsor*
   521 U.S. 591 (1997)...................................................................................................26

*Balderas v. Massage Envy Franchising, LLP*
   2014 WL 3610945, at *5 (N.D. Cal. July 21, 2014)...................................................27

*Banks v. Pyramid Consulting, Inc.*
   No. 3:18-cv-00078-H-JLB, 2019 U.S. Dist. LEXIS 13381 (S.D. Cal. Jan. 28, 2019) .................21

*Boyd v. Bechtel Corp.*
   485 F.Supp. 610 (N.D. Cal. 1979) ............................................................................28

*Carter v. Anderson Merchandisers, LP*
   No. EDCV 08-0025-VAP OPX, 2010 WL 1946784 (C.D. Cal. May 11, 2010)...........................32

*Chavez v. IBP, Inc.*
   No. CV-01-5093-RHW, 2005 WL 6304840 (E.D. Wash. May 16, 2005) ...................................22

*Churchill Village, LLC. v. Gen. Elec.*
   361 F.3d 566 (9th Cir. 2004) .............................................................................26, 36

*De Orozco v. Flagship Facility Servs.*
   No. 18-CV-2397 JLS (JLB), 2020 U.S. Dist. LEXIS 238733 (S.D. Cal. Dec. 18, 2020).............33

*Eisen v. Carlisle & Jacquelin*
   417 U.S. 156 (1974)..................................................................................................36

*Fry v. Hayt, Hayt & Landau*
   198 F.R.D. 461 (E.D. Pa. 2000)....................................................................22, 23, 24

*Guilbaud v. Sprint/United Management Co., Inc.*
   2014 WL 10676582 (N.D. Cal. 2014) .......................................................................23

*Hanlon v. Chrysler Corp.*
   150 F.3d 1011 (9th Cir. 1998) ............................................................................passim

*Holmes v. Continental Can Co.*

  706 F.2d 1144 (11th Cir. 1983) ................................................................28

*Hose v. Wash. Inventory Serv.*

  No. 14-cv-2869-WQH-AGS, 2020 U.S. Dist. LEXIS 117242 (S.D. Cal. July 2, 2020) ...............33

*Ikonen v. Hartz Mountain Corp.*

  122 F.R.D. 258 (S.D. Cal. 1988) ..............................................................22

*In re Activision Sec. Litig.*

  723 F.Supp. 1373 (N.D. Cal. 1989) ...........................................................34

*In re AT & T Mobility Wireless Data Services Sales Tax Litigation*

  789 F.Supp.2d 935 (N.D. Ill. 2011) ...........................................................28

*In re AutoZone, Inc., Wage & Hour Employment Practices Litig.*

  289 F.R.D. 526 (N.D. Cal. 2012) ..............................................................30

*In re Mego Fin. Corp. Sec. Litig.*

  213 F.3d 454 (9th Cir. 2000) .................................................................27

*In re Syncor ERISA Litig.*

  516 F.3d 1095 (9th Cir. 2008) ...............................................................26

*Kirkpatrick v. Ironwood Commc'ns, Inc.*

  No. C05-1428JLR, 2006 WL 2381797 (W.D. Wash. Aug. 16, 2006) ................................22

*Knight v. Red Door Salons, Inc.*

  2009 WL 248367 (N.D. Cal. 2009) ............................................................34

*Lewis v. Starbucks Corp.*

  No. 2:07-cv-00490-MCE-DAD, 2008 WL 4196690 (E.D. Cal. Sept. 11, 2008) ......................29

*Lynn's Food Stores, Inc. v. United States*

  679 F.2d 1350 (11th Cir. 1982) ...........................................................21, 26

*Ma v. Covidien Holding, Inc.*

  2014 WL 360196, at *4-5 (C.D. Cal. Jan. 31, 2014) ..........................................27

iv

PLAINTIFFS' MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE
ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

*Monterrubio v. Best Buy Stores, L.P.*

   291 F.R.D. 443 (E.D. Cal. 2013) ............................................................29

*Mullane v. Cent. Hanover Bank & Trust Co.*

   339 U.S. 306, 314 (1950) ....................................................................36

*Noyes v. Kelly Servs., Inc.*

   2:02-CV-2685-GEB-CMK, 2008 WL 3154681 (E.D. Cal. Aug. 4, 2008)...................35

*Officers for Justice v. Civil Serv. Comm'n*

   688 F.2d 615 (9th Cir. 1982) ...........................................................26, 27, 28

*Otey v. CrowdFlower, Inc.*

   No. 12-cv-05524-JST, 2015 U.S. Dist. LEXIS 141338 (N.D. Cal. Oct. 15, 2015)...............21, 26

*Phillips Petroleum Co. v. Shutts*

   472 U.S. 797 (1985) ..........................................................................36

*Regino Primitivo Gomez, et al. v. H&R Gunlund Ranches, Inc.*

   No. CV F 10–1163 LJO MJS, 2011 WL 5884224 (E.D. Cal. 2011)............................34

*Romero v. Producers Dairy Foods, Inc.*

   235 F.R.D. 474 (E.D. Cal. 2006) .........................................................22

*Selk v. Pioneers Mem'l Healthcare Dist.*

   159 F. Supp. 3d 1164 (S.D. Cal. 2016).....................................................21

*Silber v. Mabon*

   18 F.3d 1449 (9th Cir. 1994) .............................................................36

*Staton v. Boeing Co.*

   327 F.3d 938 (9th Cir. 2003) .........................................................33, 34

*Stovall-Gusman v. W.W. Granger, Inc.*

   2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) .....................................27

*Van Vranken v. Atl. Richfield Co.*

   901 F. Supp. 294 (N.D. Cal. 1995) ......................................................33

v

PLAINTIFFS' MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE
ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

*Vasquez v. Coast Valley Roofing*

266 F.R.D. 482 (E.D. Cal. 2010) ................................................................................34

*Vizcaino v. Microsoft Corp.*

290 F. 3d 1043 (9th Cir. 2002) .................................................................................34

*Wang v. Chinese Daily News, Inc.*

737 F.3d 538 (9th Cir. 2013) ............................................................................22, 25

*Wren v. RGIS Inventory Specialists*

No. C-06-05778 JCS, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) .................26, 32, 34

*Yokoyama v. Midland Nat. Life Ins. Co.*

594 F.3d 1087 (9th Cir. 2010) ..................................................................................25

**State Cases**

*Benton v. Telecom Network Specialists, Inc.*

220 Cal.App.4th 701 (Cal. Ct. App. 2014) ...............................................................25

*Crum v. Maricopa County*

950 P.2d 171 (Ariz. Ct. App. 1997) ..........................................................................14

*Redhair v. Kinerk, Beal, Schmidt, Dyer & Sethi, P.C.*

183 P.3d 544 (Ariz. Ct. App. 2008) ..........................................................................14

*Van Liew v. North Star Emergency Services, Inc., et al.*

No. RG17876878 (Alameda Cty. Super. Ct., Dec. 11, 2018) ....................................33

**Statutes**

29 U.S.C. § 216(b) ......................................................................................................21

29 U.S.C. § 255 ...........................................................................................................14

A.R.S. § 23-355(A) ......................................................................................................14

NY CLS Labor § 162 ...................................................................................................14

NY CLS Labor § 195 ...................................................................................................14

NY CLS Labor § 198 ...................................................................................................14

PLAINTIFFS' MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE
ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

RCW 19.86.020 ................................................................................................14

RCW 19.86.090 ................................................................................................14

**Rules**

Fed.R.Civ.P. 23(a) ..........................................................................20, 21, 22, 24

Fed.R.Civ.P. 23(b) ..........................................................................22, 23, 24, 25

Fed.R.Civ.P. 23(c) ...........................................................................................36

Fed.R.Civ.P. 23(e) ....................................................................................20, 26

**Other Authorities**

Conte, Newberg on Class Actions

    § 8.21 (3rd Ed. 1992) ................................................................................37

Conte, Newberg on Class Actions

    § 8.39 (3rd Ed. 1992) ................................................................................37

Manual for Complex Litigation, *Judicial Role in Reviewing a Proposed Class Action Settlement*

    § 21.61 (4th ed. 2004) ...............................................................................20

Manual for Complex Litigation, Settlement Notice

    § 21.312 (4th ed. 2004) .............................................................................37

Posner, Economic Analysis of the Law (4th ed. 1992) ...........................................35

vii

PLAINTIFFS' MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE
ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

## I.   INTRODUCTION

This class and collective action (the "Lawsuit") is brought on behalf of current and former non-exempt employees for Defendant Sprint/United Management Company ("Defendant" or "Sprint"), who, among other things, worked in Sprint's retail stores selling and setting up cellular phones, devices, accessories, and related service plans. The Lawsuit is based on Defendant's alleged violations of federal, Arizona, Colorado, New York, Ohio, and Washington labor laws.[1]

After almost two years of intense litigation, including extensive motion practice, conditional certification, a bitterly-disputed FLSA notice process, voluminous formal and informal discovery and related disputes, a Mandatory Settlement Conference, a full mediation with Jeff Ross, comprehensive arm's-length negotiations between counsel, and a multi-month process of negotiating the terms and provisions of the long form settlement agreement, the Parties have reached a settlement of the Lawsuit, memorialized in the proposed Class and Collective Action Settlement Agreement and Release ("Settlement" or "Settlement Agreement"). Plaintiffs seek preliminary approval of the Settlement as to the Arizona, Colorado, New York, Ohio, and Washington Classes and approval of the Settlement as to the Collective.[2]

The Parties have resolved the claims of approximately 9,450 non-exempt retail employees[3] for a total non-reversionary settlement of $7,600,000. The Settlement provides an excellent result for the Classes and Collective and an efficient outcome in the face of uncertain litigation. It provides a strong recovery for thousands of wage and hour claims unlikely to have been prosecuted as individual actions. The Settlement is fair, reasonable, and adequate in all respects, and Plaintiffs respectfully request that the Court grant the requested approvals.

---

[1] The Lawsuit also alleged claims under the California Labor Code on a putative class basis, but as explained hereinafter, the California class claims have been resolved in another action.

[2] The Settlement is attached as **Exhibit 1** to the accompanying Declaration of Carolyn Hunt Cottrell in Support of Plaintiffs' Motion for Preliminary Approval of Class and Collective Action Settlement ("Cottrell Decl.").

[3] This figure in based on class data compiled for the July 2020 mediation. Pursuant to the Settlement Agreement, Defendant will provide the Settlement Administrator updated class data that includes information for all Putative Class Members and Opt-in Plaintiffs up to December 31, 2020.

## II. FACTUAL BACKGROUND

Sprint was a cellular-phone service provider and retailer of phones, plans, and related accessories. Cottrell Decl., ¶ 9. Prior to its acquisition by T-Mobile, Sprint was the fourth-largest mobile-network operator in the United States. *Id*. Sprint's non-exempt employees, who held various positions including Retail Consultant, Lead Retail Consultant, Sales Representative, Keyholder, Assistant Manager, and other such positions outlined more fully in the Settlement Agreement, carried out the core sales and support roles at its retail stores.[4] *Id*., ¶ 10. Though variously titled, the primary duties of each of these positions was to sell and set up cellular phones, devices, accessories, and related service plans, assist customers with phone and service issues, troubleshoot equipment issues, making repairs to broken phones and devices, process insurance claims, monitor customer traffic within the store, and sell related products and services to Sprint's customers. *Id*.

Plaintiffs allege that Class Members—who worked difficult hours in a demanding retail setting—experienced wage and hour violations in their work with Sprint. *Id*., ¶ 11. In particular, Plaintiffs allege that the Class Members experienced significant amounts of off-the-clock work, including:

- Unlocking the store and disengaging Sprint's alarm system (opening shifts);
- Logging into Sprint's computer system and timekeeping system;
- Waiting for all employees to clock out to leave together, locking doors, and setting Sprint's alarm system (closing shifts);
- Taking phone calls from managers, employees and customers;
- Communicating with managers and employees via mobile messaging applications (e.g., "GroupMe");
- Submitting expense reports and job-related paperwork;
- Attending mandatory conference calls; and
- Working during meal breaks.

*Id*., *see also* ECF 1. Plaintiffs further allege that the Class Members could not take timely, full, off-duty meal and rest periods, due to a lack of break relief and the

---

[4] Plaintiffs and members of the proposed Classes and Collective are referred to hereafter as "Class Members" or "retail employees" for ease of reading.

demands of the customer-focused retail environment. *Id.*, ¶ 12. As a result of these alleged violations, Plaintiffs allege that Defendant systematically violated the Fair Labor Standards Act, as well as the state laws of Arizona, Colorado, New York, Ohio, and Washington.[5]

Defendant has at all times denied, and continues to deny, all of these allegations, and denies any and all liability for Plaintiffs' claims. Defendant further denies that Plaintiffs' allegations are appropriate for class, collective, and/or representative treatment for any purpose other than for settlement purposes only.

### III.   PROCEDURAL HISTORY

#### A.   Plaintiffs' Claims

Plaintiff Vladimir Amaraut filed this Lawsuit on February 28, 2019. ECF 1. In his initial complaint, Plaintiff Amaraut alleged that Sprint violated the Fair Labor Standards Act ("FLSA") and the wage and hour laws of California by failing to pay him and other non-exempt employees their earned wages (including required California overtime and minimum wages), failing to provide legally compliant meal and rest periods, and committing related derivative violations. On this basis, Plaintiff Amaraut brought claims against Sprint on behalf of a putative FLSA collective and a putative California class, and for civil penalties under the California Labor Code Private Attorneys General Act ("PAGA"), with Schneider Wallace Cottrell Konecky LLP serving as his counsel.[6]

In mid-2019, the Shavitz Law Group, P.A. was separately investigating an FLSA case against Sprint and identified that Plaintiff Amaraut and his counsel were also

---

[5] Plaintiff McCollum represents the Arizona Class, Plaintiff Quinn Myers represents the Colorado Class, Plaintiff Katherine Almonte represents the New York Class, Plaintiff Kristopher Fox represents the Ohio Class, and Plaintiff Marissa Painter as represents the Washington Class. Plaintiff Amaraut represents the nationwide Fair Labor Standards Act Collective.

[6] Plaintiff Amaraut also asserts a claim on an individual basis for unlawful deductions from commissions under Cal. Lab. C. §§ 221-223. This claim, along with related derivative claims for wage statement violations and waiting time penalties, was brought on a class basis in *Caudle v. Sprint/United Mgmt. Co.*. Case No. 3:17-cv-06874-WHA ("*Caudle*"). *See* ECF 20. To preserve the full scope of his California claims, Plaintiff Amaraut opted out of the certified *Caudle* class action on February 22, 2019. Cottrell Decl., ¶ 42. Caudle settled on a class basis, with final approval granted on December 16, 2019.  *See* 2019 U.S. Dist. LEXIS 216056 (N.D. Cal. Dec. 16, 2019).

pursuing the nationwide FLSA claim. The Plaintiffs and firms agreed to jointly prosecute the claims. Cottrell Decl., ¶ 15; *see* ECF 24. The Parties filed a joint motion to amend the complaint to add the new Plaintiffs and putative Rule 23 classes for state law claims under Arizona, Colorado, New York, Ohio, and Washington law. ECF 45. Plaintiffs filed their First Amended Complaint ("FAC") on November 1, 2019. ECF 47.

Prior to the instant Lawsuit, a different plaintiff, Antonio Navarrete, had filed an overlapping California Labor Code class action on behalf of these employees on January 29, 2019.[7] *See* ECF 20. Plaintiff Navarrete brought the same class claims that Plaintiff Amaraut alleges in the instant action. Plaintiff Navarrete and Sprint reached an agreement to settle the California class and PAGA claims, and Sprint filed a Notice of Settlement of Related Actions in this case on December 12, 2019. *See* ECF 59. Ultimately, the Parties agreed to resolve the FLSA claims and the Arizona, Colorado, New York, Ohio, and Washington law claims in this Lawsuit, while the California claims are being resolved in *Navarrete*.[8]

**B. Initial Agreement to Attend Mediation**

Going back to the Rule 26(f) conference on April 24, 2019 and the Early Neutral Evaluation on May 14, 2019, the Parties discussed the possibility of early mediation. *See* ECF 14; Cottrell Decl., ¶ 16. The Parties agreed to use renowned mediator Mark Rudy on August 20, 2019 and obtained a March 2020 mediation date. *Id.*, ¶ 17. The Parties lodged their joint mediation plan with Magistrate Judge Allison H. Goddard, setting forth the mediation date and outlining agreed-upon mediation discovery, on

---

[7] After initially filing the putative class complaint in Orange County Superior Court, Sprint removed the case to the Central District on April 30, 2019. *See Navarrete v. Sprint/United Management Company, et al.,* Case No. 8:19-cv-00794-AG-ADS (C.D. Cal.) ("*Navarrete*"). Plaintiff Navarrete filed a separate, PAGA-only case in Orange County Superior Court on April 5, 2019. *Navarrete v. Sprint/United Management Company, et al.,* Case No. 30-2019-01062047-CU-OE-CXC (Orange County Superior Court) ("*Navarrete-PAGA*").

[8] The *Navarrete* motion for preliminary approval has been filed and is currently pending. The *Navarrete* class members who have opted in to the FLSA Collective in this case will be receive settlement payments from both cases. Plaintiff Amaraut will opt out of the *Navarrete* settlement following its preliminary approval. Cottrell Decl., ¶ 42.

October 23, 2019.[9] *Id*. The Parties also agreed to stipulate to FLSA conditional certification to shape the scope of the representative FLSA claim prior to mediation. *Id*., ¶ 18.

Defendant commenced production of the mediation discovery data in February 2020. *Id*., ¶ 36. As the March 24, 2020 mediation date approached, however, the Covid-19 pandemic hit with full force. Mr. Rudy notified the Parties on March 12, 2020 that the mediation would take place by videoconference. *Id*., ¶ 40. Defendant declined to proceed with a videoconference mediation at that time, and the Parties were required to reschedule. *Id*. The Parties later booked a mediation with Jeff Ross, another highly respected mediator of wage and hour actions, for July 27, 2020. *Id*.

The agreement to mediate, necessity of extensive mediation discovery, simultaneous formal discovery and related motion practice, and continuance of the mediation date all shaped the course of litigation with the Court's regular involvement. Judge Goddard conducted twelve status conferences and discovery conferences with the Parties to navigate these issues.[10] The Court issued five case management orders, and fashioned a case schedule to allow for vigorous litigation while also accommodating settlement negotiations.[11]

## C. FLSA Conditional Certification

The Parties jointly moved for conditional certification of the FLSA Collective, which the Court granted on November 4, 2019. ECF 46, 48. The Parties' conditional certification agreement contemplated that the FLSA notice and opt-in form would be disseminated via U.S. Mail (to each worker's last known mailing address) and e-mail (to each worker's last known personal email address), and that workers who had opted into other FLSA actions or fully released their wage and hour claims in prior settlements would be excluded from the notice process. *See* ECF 46. Defendant agreed

---

[9] Judge Goddard assisted the Parties in negotiating the specific contours of the mediation discovery, including at the Status Conference on February 24, 2020. *See* ECF 116, 117.

[10] *See* ECF 41, 57, 67, 92, 117, 128, 138, 152, 170, 171, 173, 182.

[11] ECF 19, 42, 53, 93, 154. The case schedule has been suspended as a result of the proposed settlement. *See* ECF 181.

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

to provide, *inter alia*, the names, mailing addresses, and personal email addresses on file with the company at sprint.com/careers (to the extent available) to the notice administrator, subject to a protective order.[12] *Id*. Plaintiffs proposed Heffler Claims Group ("Heffler") as the notice administrator, which the Court approved on November 18, 2019. ECF 49, 51. Given the nationwide scope of the Collective, the FLSA notice and opt-in form were ultimately sent to over 34,000 individuals. Cottrell Decl., ¶ 18.

The resulting FLSA notice process was vigorously disputed with significant motion practice. On November 20, 2019, Defendant's counsel advised that Defendant was experiencing difficulty in assembling the personal email addresses for the potential Collective members. *Id*., ¶ 19. Ahead of the December 13, 2019 deadline for notice dissemination, Defendant provided Heffler with name and mailing addresses for approximately 33,000 workers but provided personal email addresses for 7,983 of these persons. *Id*., ¶ 20. Plaintiffs' counsel insisted that Defendant provide personal email addresses for the remaining individuals, citing the joint motion and Court's order granting conditional certification, and negotiations leading thereto. *Id*. In the interest of disseminating notice while the limitations period continued to run, Plaintiffs permitted the notice process to proceed to the extent possible. *Id*., ¶ 21.

On the eve of notice dissemination, Defendant filed an Emergency Motion for Temporary Restraining Order, or in the Alternative, an Emergency Motion for Preliminary Injunction to enjoin the notice process as to the entirety of the Collective. ECF 60. Defendant filed this emergency motion on the same day that it filed the notice of the *Navarrete* settlement. *See* ECF 59. The basis for the motion was that the *Navarrete* settlement would resolve both the California law claims and the FLSA claims for the non-exempt California employees, thereby settling the claims for a considerable portion of the recipients of the FLSA notice in the instant case.[13] *See* ECF

---

[12] The Parties executed a stipulated protective order to protect confidential information, which the Court entered on November 26, 2019. ECF 53, 54.

[13] In final form, the *Navarrete* settlement releases both California Labor Code and FLSA claims, except that any retail employees that opted in to this case do not release their FLSA claims. The instant settlement releases FLSA claims only for Opt-In Plaintiffs, and does not release California claims (except to the extent of Plaintiff Amaraut individually). Thus, the two settlements do not

60. Plaintiff filed an opposition on December 12, 2019—the same day that Defendant filed its moving papers—and the Court denied the motion the next day. *See* ECF 61, 62. Heffler then disseminated the notice and opt-in form to 32,995 recipients via U.S. Mail and to 7,983 recipients via email on December 13, 2019. Cottrell Decl., ¶ 21.

### D. Plaintiffs' Motion for Additional FLSA Notice

On December 17, 2019, Plaintiffs filed a motion for corrective sanctions to remedy Defendant's asserted failure to provide personal e-mail addresses and improper exclusion of potential Collective members on the basis of other wage and hour actions. ECF 64. This comprehensive motion set forth in specific detail the Parties' agreements regarding mediation, conditional certification, and FLSA notice, and included 39 exhibits (over 400 pages) of attorney correspondence. *See* ECF 64-3. Plaintiffs also filed an *ex parte* motion for an order shortening the time for Plaintiffs' motion for corrective sanctions to be heard.[14] ECF 65.

After a status conference with Judge Goddard on December 18, 2020, Defendant offered to provide the sprint.com work email addresses to the notice administrator as a means to provide further electronic notice. Cottrell Decl., ¶ 22. Plaintiffs agreed to this but maintained that electronic notice to personal email addresses or via text message was still required.[15] *Id*. Consequently, briefing on the motion for corrective sanctions continued, with Defendant's opposition filed on December 27, 2019 and the reply brief on January 3, 2020. ECF 72, 80.

During the pendency of the motion for corrective sanctions, Plaintiffs also moved to compel production of class list information, including names and contact information, for all potential members of the FLSA Collective and the putative California Class.[16] *See* ECF 57, 58, 69. The Court granted Plaintiffs' motion in full on December 14, 2019. *See* ECF 91. Defendant thereafter produced the class list

---

conflict with each other. *Navarrete* class members who did not opt in to *Amaraut*, and thereby release their FLSA claims in *Navarrete*, receive a higher payment under that settlement.
[14] The Court granted the *ex parte* motion on December 18, 2019. *See* ECF 66.
[15] In the second round of notice, the FLSA notice and opt-in form were sent to the sprint.com work email addresses on December 27, 2019. *Id*.
[16] Plaintiffs sought this information via Plaintiff Amaraut's first set of written discovery, as discussed below.

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

information, which included 26,945 personal email addresses for potential members of the FLSA Collective. *See* ECF 98. The number of personal email addresses greatly exceeded the 7,983 that Defendant previously provided to Heffler, and Plaintiffs notified the Court accordingly in a supplemental declaration on January 23, 2020. ECF 98. On January 24, 2020, Defendant filed its own supplemental declaration explaining to the Court how it acquired an additional 18,962 personal e-mails for its new production. ECF 101.

The Court granted in part and denied in part Plaintiffs' motion for corrective sanctions on March 23, 2020.[17] ECF 133. In particular, the Court ordered Defendant to produce all of the personal email addresses in its possession, custody, or control (including the 26,945 personal email addresses that it produced in formal discovery) to Heffler for an additional round of electronic notice to all of the addresses. The Court further ordered Defendant to produce phone numbers so that text message notice could be sent to potential Collective members that were not current employees and for whom Sprint did not have a personal email address. The Court also ordered the Parties to meet and confer regarding Defendant's exclusion of individuals from the notice process based on their involvement in other wage and hour cases.

As a result of the Court's order and subsequent negotiations between the Parties, Heffler issued the additional round of corrective notice on April 23, 2020. Cottrell Decl., ¶ 23. Heffler issued email notice to all personal email addresses that Sprint provided and text message notice where necessary.[18] *Id*. Additionally, Heffler issued U.S. Mail and electronic notice to approximately 1,379 individuals that the Parties identified were improperly excluded from the first and second rounds of notice on the

---

[17] The motion for corrective sanctions, along with Defendant's later Motion for Order Limiting Plaintiffs' and Plaintiffs' Counsel's Communications with Class and Collective Members (ECF 73) and Defendant's *ex parte* motion for order shortening time on Defendant's motion limiting communications (ECF 74), were all referred to Judge Goddard. *See* ECF 86. Defendant's motion limiting communications sought to enjoin Plaintiffs and their counsel from commenting on, providing an opinion on or encouraging opt out of the *Navarrete* settlement. After full briefing (*see, e.g.*, ECF 84, 97), Judge Goddard ultimately decided each of these motions in favor of Plaintiffs. *See* ECF 90, 133, 142.

[18] The Parties obtained Court approval for the form of text message notice. *See* ECF 141.

basis of other wage and hour actions. *Id.*

Across the three rounds of notice, Heffler sent over 34,000 notices via U.S. Mail, over 82,000 email notices, and over 4,700 text message notices.[19] *Id.*, ¶ 24. Ultimately, approximately 4,753 retail employees opted in to the *Amaraut* FLSA Collective. *See, e.g.,* ECF 177.

### E. Discovery

The Parties have engaged in extensive discovery, including voluminous formal discovery and informal mediation discovery. Plaintiff Amaraut served his first set of formal discovery requests on June 25, 2019, which sought documents and information pertaining to the putative California Class and putative FLSA Collective. Cottrell Decl., ¶ 26. These requests included 101 document requests and 17 special interrogatories. Defendant served initial responses on August 16, 2019. *Id.* Following detailed meet and confer, the Parties agreed to continue the motion to compel deadlines until after the planned March 24, 2020 mediation. *See* ECF 43, 44, 50, 52.

As referenced above, Plaintiffs proceeded to move to compel production of class list information in response to Plaintiff Amaraut's Requests for Production of Documents Nos. 1 and 2 and Special Interrogatories Nos. 1 and 2, which sought name, contact information, and other basic information for all members of the putative California Class and all potential members of the FLSA Collective. *See* ECF 57, 58, 69. After a pre-motion discovery conference on December 6, 2019, the Parties filed joint briefing on December 20, 2019. ECF 57, 69. In a lengthy ruling, the Court granted Plaintiffs' motion in full on December 14, 2019. *See* ECF 91. Defendant thereafter produced full responses to these requests on January 21, 2020. Cottrell Decl., ¶ 27.

The Parties proceeded with additional formal discovery. Defendant served formal requests on all six Plaintiffs on February 10, 2020, numbering approximately 100 document requests and 20 special interrogatories for each Plaintiff. *Id.*, ¶ 28.

---

[19] The 82,000 email notices include notices to both personal email addresses and sprint.com work email addresses, and reflect that thousands of potential Collective members were sent email notice on more than one occasion across the three rounds of notice. *Id.*

Plaintiffs served additional requests on February 12, 2020, which sought documents and information pertaining to the putative Arizona, Colorado, New York, Ohio, and Washington Classes. *Id.*, ¶ 29. Five Plaintiffs each served approximately 60 document requests and 15 special interrogatories pertaining to their respective putative Classes. *Id.*

Plaintiffs responded to Defendant's discovery requests on March 27, 2020. *Id.*, ¶ 30. Defendant responded to Plaintiffs' requests on March 30, 2020. *Id.*, ¶ 31. The Parties then engaged in extensive further meet and confer, including telephonic communications and written correspondence, as to all of the outstanding discovery. *Id.*, ¶ 32. As the Parties were unable to resolve various issues in dispute, the Court conducted numerous discovery proceedings. *See* ECF 152, 170, 171, 173. Judge Goddard held a lengthy discovery conference on May 1, 2020, after which she ordered the Parties to continue meet and confer and to file a joint status report setting forth all of the issues remaining in dispute. *See* ECF 152, 154. The Parties filed this status report, which was almost 1,000 pages long, on May 29, 2020. ECF 163.

The Court held a further discovery conference on June 19, 2020, after it exhaustively reviewed the Parties' joint status report. ECF 170. At this conference, the Court provided detailed written input on the disputes and ordered the Parties to further confer and lodge an update joint status report. *Id.* The Parties lodged the updated report on June 30, 2020, and the Court held further discovery conferences on July 1 and July 6, 2020. ECF 171, 173; Cottrell Decl., ¶ 34. The Court ordered the Parties to supplement their written responses by July 15, 2020, and to provide a summary of which responses were supplemented and which were still at issue on that date. ECF 171, 173. The Parties served supplemental responses on July 15, 2020. Cottrell Decl., ¶ 35. After reviewing the Parties' summaries, the Court set further discovery proceedings to follow the July 27, 2020 mediation; these proceedings were eventually obviated by the successful mediation. *See* ECF 175.

To date, Defendant has produced over 6,300 documents, including written policies and practices, handbooks, compensation plans, job descriptions, class and collective lists, trainings, timekeeping and payroll documents, and settlements from other cases, as well as dozens of interrogatory responses. Cottrell Decl., ¶ 36. Additionally, pursuant to the mediation plan lodged with the Court, Defendant has informally produced dozens of spreadsheets containing the timekeeping and payroll data for Opt-In Plaintiffs and for a 10% sample of each putative Class. *Id*. Defendant provided Class-wide summary figures, including the total number of Class members, number of workweeks, and additional data points. *Id*. Plaintiffs have also produced documents and extensive information in response to Defendant's special interrogatories. *Id*., ¶ 37.

Plaintiffs' counsel have completed extensive outreach with Opt-In Plaintiffs and putative Class Members, including approximately 90 in-depth intakes. *Id*., ¶ 38. The intakes covered topics including dates and locations of work, hours of work, alleged off-the-clock work, including time spent on work communications outside of shifts, meal and rest break issues, and timekeeping systems. *Id*. Through the outreach process, Plaintiffs garnered substantial factual background and data on alleged violation levels. *Id*. Together with the information from formal and informal discovery, Plaintiffs' counsel utilized the intake data to perform damages analyses to evaluate Defendant's exposure on a Class and Collective basis. *Id*., ¶ 39.

### F. Mandatory Settlement Conference and Mediation

Judge Goddard ordered the Parties to complete a Mandatory Settlement Conference ("MSC") with the Court after the March 2020 mediation date was continued. ECF 138. In advance of the May 13, 2020 MSC, the Parties exchanged settlement demands and provided detailed briefing and analysis to the Court. Cottrell Decl., ¶ 41. The Parties were not able to negotiate a settlement at the MSC, but it was beneficial in helping the Parties to clarify their positions and focus the negotiations at the ensuing private mediation. *Id*.

On July 27, 2020, the Parties participated in their long-awaited mediation session with Jeff Ross, a renowned and experienced wage and hour mediator. *Id*., ¶ 42. The session lasted some 11 hours; at the end of the night, Mr. Ross issued a mediator's proposal that contained the essential terms of the instant Settlement. *Id*. All Parties accepted the proposal on July 31, 2020. *Id*.

Throughout the mediation process, the Parties engaged in serious and arm's-length negotiations, culminating in the mediator's proposal. *Id.,* ¶ 44. Counsel then engaged in a multi-month drafting process to finalize the proposed long-form Settlement and corresponding notice documents, subject to the Court's approval. *Id.,* ¶ 45. The Settlement is complex—involving hybrid Rule 23 and FLSA claims, numerous classes, and an interplay with the *Navarrete* settlement—and the drafting process was lengthy. *Id.* As with all facets of the Lawsuit, the Settlement language was vigorously disputed, and the Parties reached impasse on several issues that were resolved with the involvement of Mr. Ross. *Id.* After an initial draft was completed, 11 sets of subsequent edits were required to arrive at an agreement that was acceptable to all Parties and counsel, along with a separate drafting and revision process for the Class, Collective, and Class/Collective Notices. *Id.*

Counsel for the Parties advised the Court of the status throughout the drafting process. *See* ECF 182-188. The Settlement Agreement was fully executed on December 10, 2020. The Parties then completed the drafting process for the preliminary approval papers, including the proposed Second Amended Complaint ("SAC") and joint motion to amend.[20] This motion follows.

## IV.   TERMS OF THE SETTLEMENT

### A. Basic Terms and Value of the Settlement

Sprint has agreed to pay a non-reversionary Maximum Gross Settlement Amount of $7,600,000.00 to settle the FLSA claims and the Arizona, Colorado, New

---

[20] The Parties have agreed that Plaintiffs will amend to substitute Opt-In Plaintiff Marissa Painter as the Class Representative for the putative Washington class, and file the accompanying stipulation and proposed SAC herewith. Ms. Painter agreed to serve as the Washington Class Representative on June 12, 2020, and the Parties agreed to her substitution in the settlement context. Cottrell Decl., ¶ 47.

York, Ohio, and Washington state law claims. Cottrell Decl., ¶ 48. The Net Settlement Amount, which is the amount available to pay settlement awards to the Collective and Class Members, is defined as the Maximum Gross Settlement Amount less: any enhancement payments awarded to the Class Representatives (up to $15,000.00 for Plaintiff Amaraut; and up to $10,000.00 each for Plaintiffs Almonte, Fox, McCollum, Myers, and Painter); the Settlement Administrator's fees and costs (estimated at $99,921.00); the Individual Amaraut Allocation[21] as approved by the Court (up to $3,999.00); and any attorneys' fees and costs awarded to Plaintiffs' counsel (fees of up to 33.33% of the Maximum Gross Settlement Amount, or $2,533,080.00, plus costs[22] not to exceed $120,000.00). *Id.*

The Gross Settlement Amount is a negotiated amount that resulted from substantial arms' length negotiations and significant investigation and analysis by Plaintiffs' counsel. Plaintiffs' counsel based their damages analysis and settlement negotiations on formal and informal discovery, including the payroll and timekeeping data, documentary evidence, and approximately 90 interviews with retail employees. Cottrell Decl., ¶ 49. Plaintiffs' counsel used workweek, rate of pay, and other data in conjunction with estimates of unpaid time to determine estimated damages for off-the-clock and overtime violations. *Id.*, ¶ 50. Based on outreach analysis, Plaintiffs applied an aggressive damage assumption of 2 hours of provable off-the-clock time per week, along with each retail employees experiencing meal and rest period violations in 50% of their shifts. *Id.*

Using these assumptions and further assuming that Plaintiffs and the Class Members would certify all of their claims and prevail at trial, Plaintiffs' counsel

---

[21] The Individual Amaraut Allocation is for Plaintiff Amaraut's release of California Labor Code claims against Sprint that he pleaded in the Lawsuit and releases on an individual basis. Plaintiff Amaraut would have received compensation for those claims under the *Caudle* and *Navarrete* settlements. The Individual Amaraut Allocation was determined by analyzing Plaintiff Amaraut's individual California Labor Code damages and discounting that amount by the same factor as the total Class and Collective exposure; the resulting $3,999 amount is roughly comparable to the amount that Plaintiff Amaraut would have received from the *Caudle* and *Navarrete* settlements. *Id.*

[22] The attorneys' costs include $93,658.00 in FLSA notice administration costs. *Id.*

calculated the total potential exposure if Plaintiffs fully prevailed on all of their claims—inclusive of derivative and penalties claims[23]—at approximately $46.6 million. *Id.*, ¶ 51. The total amount of damages is broken down as follows:

Plaintiffs calculated that unpaid wages owed, based on the assumption of 2 hours of off-the-clock work in each workweek and inclusive of overtime, would total approximately $29.9 million for all Opt-In Plaintiffs and Class Members covered by the Settlement. *Id.*, ¶ 52. The bulk of these unpaid wages ($13.9 million) are owed to the approximately 4,753 FLSA Opt-In Plaintiffs.[24] Approximately $8.0 million in unpaid wages are owed to the approximately 2,650 New York Class Members.[25] *Id.* Additionally, approximately $3.4 million is owed to the approximately 1,035 Ohio Class Members, approximately $1.7 million is owed to the approximately 640 Colorado Class Members, approximately $1.6 million is owed to the approximately 550 Washington Class Members, and approximately $1.0 million is owed to the approximately 460 Arizona Class Members.[26] *Id.*

Colorado, New York, and Washington Class Members are also able to recover for meal and rest break violations.[27] *Id.*, ¶ 53. Based on the aggressive assumption that Plaintiffs could establish that 50% of meal and rest periods are missed or otherwise non-compliant, New York Class Members are owed approximately $4.4 million,

---

[23] The derivative and penalty claims include those under the Washington Consumer Protection Act, which allows for up to treble damages for unpaid wages on a discretionary basis, capped at $25,000 per person. *See* RCW 19.86.020, 19.86.090. Arizona law also provides for up to treble damages for unpaid wages on a discretionary basis. A.R.S. § 23-355(A); *Crum v. Maricopa County*, 950 P.2d 171 (Ariz. Ct. App. 1997). New York law provides for a derivative wage statement claim under the New York Wage Theft Prevention Act. *See* NY CLS Labor § 195(3). In this analysis, Plaintiffs assess 1x further damages for jurisdictions with treble damages statutes, but do not otherwise liquidate damages.

[24] Plaintiffs apply a three-year limitations period for the FLSA claim, although this would be, and has been, vehemently disputed by Defendant. *See* 29 U.S.C. § 255(a).

[25] New York Law provides a lengthy six-year statute of limitations period for unpaid wage claims, resulting in a relatively high number of Class Members and higher average per-Class Member recoveries. *See* NY CLS Labor § 198(3).

[26] The differences in the total exposure estimates across the various jurisdictions reflect that the number of Class Members and average tenure vary from jurisdiction to jurisdiction, as well as the variances in the respective laws. For example, Arizona has a one-year statute of limitations for unpaid wage claims. *Redhair v. Kinerk, Beal, Schmidt, Dyer & Sethi, P.C.*, 183 P.3d 544, 551 (Ariz. Ct. App. 2008)

[27] See Colorado Overtime and Minimum Pay Standards Order, 7 CCR 1103-1; NY CLS Labor § 162; WAC 296-126-092.

Colorado Class Members are owed approximately $980,000, and Washington Class Members are owed approximately $925,000 for break violations. *Id*. Additionally, Plaintiffs calculate further penalties under the New York Labor Law at approximately $6.6 million, under Washington law at approximately $2.6 million, and Arizona law at approximately $1.0 million. *Id*. Totaling the estimated damages for unpaid wages of $29.9 million, the meal and rest break damages of $6.4 million, and further penalties of $10.3 million yields the total estimated exposure of approximately $46.6 million. *Id*., ¶ 54.

The negotiated non-reversionary Maximum Gross Settlement Amount of $7,600,000.00 represents more than 25% of the approximately $29.9 million that Plaintiffs calculated for the core unpaid wages claims. *Id*., ¶ 40. When adding meal and rest period exposure and potential penalties, the $7,600,000 million settlement amount represents approximately 16.3% of Defendant's total potential exposure of $46.6 million. *Id*. These figures are based on Plaintiffs' assessment of a best-case-scenario. To have obtained such a result at trial, Plaintiffs would have had to prove that all Class Members experienced the violations at the levels described above for every shift and every workweek. *Id*.

Plaintiffs and their counsel considered the significant risks of continued litigation, described hereinafter, when considering the proposed Settlement. *Id*., ¶ 56. These risks were front and center, particularly given the nature of the off-the-clock work and that the retail employees worked in hundreds of varying locations, under differing supervisors and managers, which would invariably complicate certification efforts and proving the claims on the merits. *Id*. The types of off-the-clock work at issue also entail evidentiary issues as to the violation levels that could be established, particularly with respect to after-hours communications. *Id*.

In contrast, the Settlement will result in immediate and certain payment to Opt-In Plaintiffs and Class Members of meaningful amounts. *Id*., ¶ 57. The average overall gross recovery is approximately $807.00 per participating retail employee, and the

average overall net recovery is approximately $507.00 per person.[28] *Id*. This amount provides significant compensation to the Collective and Class Members, and the Settlement provides an excellent recovery in the face of highly uncertain litigation. In light of all of the risks, the settlement amount is fair, reasonable, and adequate. *Id*.

### B. Class and Collective Definitions

An individual is eligible to share in the proposed Settlement if he or she belongs to any of the following[29]:

- The Putative **Arizona** Class includes any current or former non-exempt employee of Defendant working in Sprint's retail establishments in the state of Arizona from February 28, 2018 through December 31, 2020.
- The Putative **Colorado, Ohio, and Washington** Classes includes any current or former non-exempt employee of Defendant working in Sprint's retail establishments in those respective states from February 28, 2016 through December 31, 2020.
- The Putative **New York** Class includes any current or former non-exempt employee of Defendant working in Sprint's retail establishments in the state of New York from February 28, 2013 through December 31, 2020.
- **Opt-In Plaintiffs** are all persons nationwide that were employed by Defendant as a retail non-exempt employee from February 28, 2016 through December 31, 2020, who have filed (and not withdrawn) a consent-to-join form as of the date of filing of this motion.

### C. Allocation and Awards

The Net Settlement Amount to be paid to Class Members is approximately $4,778,000.00. Cottrell Decl., ¶ 48. The Parties allocated the Net Settlement Amount to the Collective and respective Classes based on Plaintiffs' exposure analysis, which reflects the differences in class sizes, number of workweeks, and wage and hour laws across the jurisdictions. *Id*. 70% of the Net Settlement Amount is allocated to the state law Classes (the "Class Net Settlement Amount," approximately $3,344,600.00) and

---

[28] These amounts divide Maximum Gross Settlement Amount and the Net Settlement Amount, respectively, by the approximately 9,450 unique Opt-In Plaintiffs and Class Members. The average recoveries for each jurisdiction are set forth in the Allocation and Awards section below. The recoveries under this Settlement compare favorably with the recoveries under the *Navarrete* settlement, where the gross settlement amount is $2,750,000.00 for approximately 5,700 California class members.

[29] The Putative Classes are to be certified for settlement purposes only under Federal Rule of Civil Procedure 23.

30% is allocated to the Collective (the "FLSA Net Settlement Amount," approximately $1,433,400.00).[30] Settlement Agreement, ¶ IV.E.

Class Members will each receive a settlement award check without the need to submit a claim form.[31] Settlement Agreement, ¶ VI.A. Each Collective and Class Member will receive a settlement share from the applicable Class Net Settlement Amount and/or FLSA Net Settlement Amount, based on the number of weeks that the individual worked for Defendant during the applicable Settlement Period(s) in comparison to the total number of workweeks for that jurisdiction.[32] Settlement Agreement, ¶ IV.E. Individuals that are both Opt-In Plaintiffs and Settlement Class Members will be eligible to receive a share from the FLSA Net Settlement Amount and additionally a share from their respective state law Class. Settlement Agreement, ¶ IV.E.

The Class, Collective, and Class/Collective Notices will provide the estimated Payout Calculation and number of workweeks for each Collective and Class Member, assuming full participation in the Settlement. Settlement Agreement, Exhs. A-C. Settlement award and eligibility determinations will be based on employee workweek information, the data for which Sprint will provide to the Settlement Administrator; however, retail employees will be able to dispute their workweeks by submitting evidence that they worked more workweeks than shown by Sprint's records. Settlement Agreement, ¶ IV.C.

Defendant is to fund the Settlement within 30 business days after the occurrence

---

[30] The Class Net Settlement Amount is further allocated as follows: 6.6% to the Putative Arizona Class (approximately $220,743), 8.4% to the Putative Colorado Class (approximately $280,946), 58.8% to the Putative New York Class (approximately $1,966,624), 10.3% to the Putative Ohio Class (approximately $344,493), and 15.9% to the Putative Washington Class (approximately $531,791). Settlement Agreement, ¶ IV.E; Cottrell Decl., ¶ 60.

[31] Class Members are not required to submit an Opt-In Form to receive payment under the Settlement for their work in Arizona, Colorado, New York, Ohio, and Washington during the relevant time periods. However, only Opt-In Plaintiffs will be credited for work in other states, as the damages for work in those states are attributable to FLSA claims only.

[32] The average net recovery is approximately $477 for Putative Arizona Class Members, $438 for Putative Colorado Class Members, $740 for Putative New York Class Members, $332 for Putative Ohio Class Members, $972 for Putative Washington Class Members, and $301 for FLSA Opt-In Plaintiffs. Cottrell Decl., ¶ 62,

of the "Effective Date," and Heffler is to distribute the payments within 10 business days thereafter. Settlement Agreement, ¶ VII.A-B. Settlement award checks will remain valid for 120 days from the date of their issuance. Settlement Agreement, ¶ IV.E. Uncashed check funds attributable to the Class Net Settlement Amount will be redistributed to those Settlement Class Members that negotiated their Settlement checks, and uncashed check funds attributable to the FLSA Net Settlement Amount will be redistributed to those Opt-In Plaintiffs that negotiated their Settlement checks. *Id*. If the uncashed check funds are *de minimis*, or if there are remaining uncashed check funds after the redistribution, they will revert to the *cy pres* recipient. *Id*. The Parties propose the State Bar of California's Justice Gap Fund as the *cy pres* recipient. *Id*.

### D. Scope of Release

The releases contemplated by the proposed Settlement are dependent upon whether the Participating Individual is an Opt-In Plaintiff and/or a Settlement Class Member, and are tethered to the factual allegations. Opt-In Plaintiffs will release any and all claims under the FLSA relating to the allegations that were asserted, or could have been asserted, in the Lawsuit, through and including December 31, 2020, as detailed further in the Settlement Agreement. Settlement Agreement, ¶ II.19. The release of claims by each Opt-In Plaintiff extends to FLSA claims that are asserted or could have been asserted based on the same factual predicate alleged in the Complaint. *Id*. Opt-In Plaintiffs do not release any state law claims, except to the extent that they may also be Settlement Class Members.

Settlement Class Members will release any and all claims under the state laws of Arizona, Colorado, New York, Ohio, and Washington, relating to the allegations that were asserted, or could have been asserted, in the Lawsuit, through and including December 31, 2020. Settlement Agreement, ¶ II.30. The release includes any wage and hour claim that could have been asserted under the respective Arizona, Colorado, New York, Ohio, and Washington state wage and hour law, or any other equivalent federal law or local law, and thus encompasses the FLSA claim, as detailed further in the

Settlement Agreement.[33] The release of claims by each Settlement Class Member extends to claims that are asserted or could have been asserted based on the same factual predicate alleged in the Complaint. *Id*.

The releases are effective upon the Effective Date of the Settlement. Settlement Agreement, ¶ VIII.A. The Settlement Agreement releases the "Released Parties," which encompasses Defendant and their related persons and entities. Settlement Agreement, ¶ II.24. The Named Plaintiffs also agree to a general release. Settlement Agreement, ¶ II.14.

### E. Settlement Administration

The Parties have agreed to use Heffler Claims Group to administer the Settlement, for total fees and costs currently estimated at $99,921.00. Cottrell Decl., ¶ 70. The Settlement Administrator will distribute the Notice Packets via U.S. Mail and e-mail, calculate the total number of workweeks for each Settlement Class Member and Opt-In Plaintiff (if needed), calculate individual settlement payments, calculate all applicable payroll taxes, withholdings and deductions, and prepare and issue all disbursements to Class and Collective Members, Plaintiffs, Plaintiffs' counsel, and applicable state and federal tax authorities. *Id.*; Settlement Agreement, ¶¶ V.A-G. The Settlement Administrator is also responsible for the timely preparation and filing of all tax returns and reporting, and will make timely and accurate payment of any and all necessary taxes and withholdings. *Id*. The Settlement Administrator will establish a settlement website that will allow Class Members to view the Class, Collective, and Class/Collective Notices (in generic form), the Settlement Agreement, and all papers filed by Class Counsel to obtain preliminary and final approval of the Settlement. Settlement Agreement, ¶ V.E. The Settlement Administrator will also establish a toll-free call center for telephone inquiries from Class Members. *Id*.

---

[33] The state wage statutes that Plaintiffs pleaded, and Plaintiffs' damages analyses thereunder, incorporate unpaid wage protections that are greater than the FLSA.

## V. ARGUMENT

### A. The Court Should Grant Preliminary Approval of the Settlement as to the Arizona, Colorado, New York, Ohio, and Washington Classes and Approval of the Settlement as to the Collective.

A certified class action may not be settled without Court approval. *See* Fed.R.Civ.P. 23(e). Approval of a class action settlement requires three steps: (1) preliminary approval of the proposed settlement upon a written motion; (2) dissemination of notice of the settlement to all class members; and (3) a final settlement approval hearing at which objecting class members may be heard, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement is presented. Manual for Complex Litigation, *Judicial Role in Reviewing a Proposed Class Action Settlement*, § 21.61 (4th ed. 2004). The decision to approve or reject a proposed settlement is committed to the sound discretion of the court. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998). Rule 23 requires that all class action settlements satisfy two primary prerequisites before a court may grant certification for purposes of preliminary approval: (1) that the settlement class meets the requirements for class certification if it has not yet been certified; and (2) that the settlement is fair, reasonable, and adequate. Fed.R.Civ.P. 23(a), (e)(2); *Hanlon*, 150 F.3d at 1020.

This class action settlement satisfies the requirements of Rule 23(a) and (b), and it is fair, reasonable, and adequate in accordance with Rule 23(e)(2). Cottrell Decl., ¶ 72. Accordingly, the Court should preliminarily approve the Settlement as to the Classes.[34]

In the FLSA context, court approval is required for FLSA collective settlements, but the Ninth Circuit has not established the criteria that a district court must consider in determining whether an FLSA settlement warrants approval. *See, e.g., Selk v. Pioneers Mem'l Healthcare Dist.,* 159 F. Supp. 3d 1164, 1172 (S.D. Cal. 2016); *Banks*

---

[34] Plaintiffs acknowledge that, in the event that the Settlement is not approved by the Court, class and collective certification would be contested by Defendant, and Defendant fully reserves and does not waive any arguments and challenges regarding the propriety of class and collective action certification.

*v. Pyramid Consulting, Inc.*, No. 3:18-cv-00078-H-JLB, 2019 U.S. Dist. LEXIS 13381, at *6 (S.D. Cal. Jan. 28, 2019). Most courts in this Circuit, however, first consider whether the named plaintiffs are "similarly situated" to the putative class members within the meaning of 29 U.S.C. § 216(b), and then evaluate the settlement under the standard established by the Eleventh Circuit in *Lynn's Food Stores, Inc. v. United States*, 679 F.2d 1350, 1355 (11th Cir. 1982), which requires the settlement to constitute "a fair and reasonable resolution of a bona fide dispute over FLSA provisions." *Otey v. CrowdFlower, Inc.,* No. 12-cv-05524-JST, 2015 U.S. Dist. LEXIS 141338, at *12 (N.D. Cal. Oct. 15, 2015) "If a settlement in an employee FLSA suit does reflect a reasonable compromise over issues...that are actually in dispute," the district court may "approve the settlement in order to promote the policy of encouraging settlement of litigation." *Lynn's Food Stores*, 679 F.2d at 1354; *Otey*, 2015 U.S. Dist. LEXIS 141338, at *12.

The Court has already conditionally certified a collective under § 216(b) for Plaintiffs' FLSA claims, and 4,753 retail employees have filed opt-in forms. *See* ECF 177; Cottrell Decl., ¶ 73. Defendant has not moved for decertification of the FLSA claim. The proposed Settlement provides an excellent recovery to the Opt-In Plaintiffs in a reasonable compromise. Accordingly, the Court should approve the Settlement as to the Collective.

### B. The Court Should Conditionally Certify the Arizona, Colorado, New York, Ohio, and Washington Classes.

A class may be certified under Rule 23 if (1) the class is so numerous that joinder of all members individually is "impracticable"; (2) questions of law or fact are common to the class; (3) the claims or defenses of the class representative are typical of the claims or defenses of the class; and (4) the person representing the class is able to fairly and adequately protect the interests of all members of the class. Fed.R.Civ.P. 23(a). Furthermore, Rule 23(b)(3) provides that a class action seeking monetary relief may only be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently

adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Applying this standard, numerous cases similar to this case have certified classes of employees who have suffered wage and hour violations under the wage and hour laws of these states.[35] Likewise, Plaintiffs contend that the Arizona, Colorado, New York, Ohio, and Washington Classes meet all of these requirements.

### 1. The Classes are numerous and ascertainable.

The numerosity prerequisite demands that a class be large enough that joinder of all members would be impracticable. Fed.R.Civ.P. 23(a)(1). While there is no exact numerical cut-off, courts have routinely found numerosity satisfied with classes of at least forty members. *See, e.g., Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988); *Romero v. Producers Dairy Foods, Inc.*, 235 F.R.D. 474, 485 (E.D. Cal. 2006). Plaintiffs contend that the approximately 460 Arizona Class Members, 640 Colorado Class Members, 2,650 New York Class Members, 1,035 Ohio Class Members, and 550 Washington Class Members render each Class so large as to make joinder impracticable. Cottrell Decl., ¶ 74. The Class Members may be readily identified from Sprint's payroll records. *Id.*

### 2. Plaintiffs' claims raise common issues of fact or law.

The commonality requirement of Rule 23(a)(2) "is met if there is at least one common question or law or fact." *Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461, 467 (E.D. Pa. 2000). Rule 23(a)(2) has been construed permissively. *Hanlon*, 150 F.3d at 1019. Plaintiffs "need not show that every question in the case, or even a preponderance of questions, is capable of classwide resolution." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013). "[E]ven a single common question" can satisfy the commonality requirement of Rule 23(a)(2). *Id.*

---

[35] *See, e.g., Weinstein v. Jenny Craig Operations, Inc.*, 2016 NY Slip Op 02932, ¶ 1, 138 A.D.3d 546, 546, 30 N.Y.S.3d 618, 619 (App. Div. 1st Dept.) (affirming certification of unpaid wage class action under New York law); *Henix v. Liveonny, Inc.*, 2019 NY Slip Op 31444(U), ¶ 12 (N.Y. Sup. Ct. Mar 23, 2019) (certifying off-the-clock class action under New York law); *Kirkpatrick v. Ironwood Commc'ns, Inc.*, No. C05-1428JLR, 2006 WL 2381797, at *14 (W.D. Wash. Aug. 16, 2006) (certifying Washington Rule 23 class in a case involving off-the-clock, overtime, and meal break violations under Washington law); *Chavez v. IBP, Inc.*, No. CV-01-5093-RHW, 2005 WL 6304840, at *2 (E.D. Wash. May 16, 2005) (denying motion to decertify FLSA and Rule 23 classes of employees asserting federal and Washington law claims for wage and hour violations).

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

Plaintiffs contend that common questions of law and fact predominate here, satisfying paragraphs (a)(2) and (b)(3) of Rule 23, as alleged in the Operative Complaint. Cottrell Decl., ¶ 75. Defendant has uniform policies applicable to all retail employees. *Id.*, ¶ 66. Specifically, Plaintiffs allege that Class Members all perform essentially the same job duties—providing sales and support for cell phones, plans, and accessories. Plaintiffs allege that the wage and hour violations are in large measure borne of standardized policies, practices, and procedures, creating pervasive issues of fact and law that are amenable to resolution on a class-wide basis. In particular, Class Members are subject to the same: hiring and training process; timekeeping, payroll, and compensation policies; team communication policies; meal and rest period policies and practices; and reimbursement policies. *Id.* Plaintiffs' other derivative claims will rise or fall with the primary claims. *Id.* Because these questions can be resolved at the same juncture, Plaintiffs contend the commonality requirement is satisfied for the Classes. *Id.*

With regards to the Collective, this Court has already made an initial determination that the retail employees are similarly situated. The conditional certification motion called on the Court to "decid[e] whether a collective action should be certified for the purpose of sending notice of the action to potential class members." *Guilbaud v. Sprint/United Management Co.*, Inc., 2014 WL 10676582, *1 (N.D. Cal. 2014). The Court concluded that Plaintiffs have satisfied their burden of making substantial allegations showing retail employees were subject to a common practice or policy that violated the FLSA. ECF 48, p. 4. Because Defendant maintains various common policies and practices as to what work it compensates and what work it does not compensate, and applies these policies and practices to the retail employees, Plaintiffs contend that there are no individual defenses available to Defendant. *Id.*, ¶ 67.

### 3. Plaintiffs' claims are typical of the claims of the Classes.

"Rule 23(a)(3) requires that the claims of the named parties be typical of the claims of the members of the class." *Fry*, 198 F.R.D. at 468. "Under the rule's

permissive standards, a representative's claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. Here, Plaintiffs contend that their claims are typical of those of all other Class Members. Cottrell Decl., ¶ 78. They were subject to the alleged illegal policies and practices that form the basis of the claims asserted in this case. *Id.* Interviews with Class Members and review of timekeeping and payroll data confirm that the employees throughout the United States were subjected to the same alleged illegal policies and practices to which Plaintiffs were subjected. *Id.*, ¶ 69. Thus, Plaintiffs contend that the typicality requirement is also satisfied. *Id.*

### 4. Plaintiffs and Class Counsel will adequately represent the Classes.

To meet the adequacy of representation requirement in Rule 23(a)(4), Plaintiffs must show "(1) that the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously; (2) that he or she has obtained adequate counsel, and (3) that there is no conflict between the individual's claims and those asserted on behalf of the class." *Fry*, 198 F.R.D. at 469. Plaintiffs' claims are in line with the claims of the Classes, and Plaintiffs' claims are not antagonistic to the claims of the Putative Class Members. Cottrell Decl., ¶ 80. Plaintiffs have prosecuted this case with the interests of the Class Members in mind. *Id.* Moreover, Plaintiffs' counsel has extensive experience in class action and employment litigation, including wage and hour class actions, and do not have any conflict with the Classes. *Id.*, ¶¶ 6-8, 81; Shavitz Decl., ¶¶ 4-13.

### 5. The Rule 23(b)(3) requirements for class certification are also met.

Under Rule 23(b)(3), Plaintiffs must demonstrate that common questions "predominate over any questions affecting only individual members" and that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." "The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues' in the case and 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"

*Wang,* 737 F.3d at 545.

Here, Plaintiffs contend the common questions raised in this action predominate over any individualized questions concerning the Classes. Cottrell Decl., ¶ 82. The Classes are entirely cohesive because resolution of Plaintiffs' claims hinge on the uniform policies and practices of Defendant, rather than the treatment the Class Members experienced on an individual level. *Id.* As a result, Plaintiffs contend that the resolution of these alleged class claims would be achieved through the use of common forms of proof, such as Defendant's uniform policies, and would not require inquiries specific to individual Class Members.[36] *Id.*

Further, Plaintiffs contend the class action mechanism is a superior method of adjudication compared to a multitude of individual suits. Cottrell Decl., ¶ 83. To determine whether the class approach is superior, courts are to consider: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed.R.Civ.P. 23(b)(3)(A)-(D).

Here, the Class Members do not have a strong interest in controlling their individual claims. Cottrell Decl., ¶ 84. The action involves thousands of workers with very similar, but relatively small, claims for monetary injury. *Id.* If the Class Members proceeded on their claims as individuals, their many individual suits would require duplicative discovery and duplicative litigation, and each Class Member would have to personally participate in the litigation effort to an extent that would never be required in a class proceeding. *Id.* Thus, Plaintiffs contend that the class action mechanism would efficiently resolve numerous substantially identical claims at the same time

---

[36] Although the amount of time worked off-the-clock and number of missed meal and rest periods may vary, these are damages questions and should not impact class certification. *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010). The fact that individual inquiry might be necessary to determine whether individual employees were able to take breaks despite the Defendant's allegedly unlawful policy is not a proper basis for denying certification. *Benton v. Telecom Network Specialists, Inc.*, 220 Cal.App.4th 701 (Cal. Ct. App. 2014).

while avoiding a waste of judicial resources and eliminating the possibility of conflicting decisions from repetitious litigation. *Id.*

The issues raised by the present case are much better handled collectively by way of a settlement. *Id.*, ¶ 85. Manageability is not a concern in the settlement context. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 593 (1997). The Settlement presented by the Parties provides finality, ensures that workers receive redress for their relatively modest claims, and avoids clogging the legal system with numerous cases. Cottrell Decl., ¶ 86. Accordingly, class treatment is efficient and warranted, and the Court should conditionally certify the Arizona, Colorado, New York, Ohio, and Washington Classes for settlement purposes.

### C. The Settlement Should Be Preliminarily Approved as to the Classes and Approved as to the Collective Because It Is Fair, Reasonable, and Adequate.

In deciding whether to approve a proposed class or collective settlement, the Court must find that the proposed settlement is "fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(2); *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); *Lynn's Food Stores*, 679 F.2d at 1354-55; *Otey*, 2015 U.S. Dist. LEXIS 141338 at *12. Included in this analysis are considerations of: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement. *Churchill Village, LLC. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citing *Hanlon*, 150 F.3d at 1026). Importantly, courts apply a presumption of fairness "if the settlement is recommended by class counsel after arm's-length bargaining." *Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2011 WL 1230826, at *6 (N.D. Cal. Apr. 1, 2011). There is also "a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008). In light of these factors, the proposed

settlement is fair, reasonable, and adequate.

### 1. The terms of the Settlement are fair, reasonable, and adequate.

In evaluating the fairness of a proposed settlement, courts compare the settlement amount with the estimated maximum damages recoverable in a successful litigation. *In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454, 459 (9th Cir.2000). Courts routinely approve settlements that provide a fraction of the maximum potential recovery. *See, e.g.*, *Officers for Justice,* 688 F.2d at 623; *Viceral v. Mistras Grp., Inc.*, Case No. 15-cv-2198-EMC, 2016 WL 5907869, at *7 (N.D. Cal. Oct. 11, 2016) (approving wage and hour settlement which represented 8.1% of the total verdict value).[37] A review of the Settlement Agreement reveals the fairness, reasonableness, and adequacy of its terms. Cottrell Decl., ¶ 88. The Gross Settlement Amount of $7,600,000, which represents more than 25% of the approximate $29.9 million that Plaintiffs calculated in unpaid wages that would have been owed to all Collective and Class Members if each had been able to prove that he or she worked 2 hours off-the-clock in every workweek during the relevant time period. *Id*. When adding other substantive claims and potential penalties, the $7,600,000.00 settlement amount represents approximately 16.3% of Defendant's total potential exposure of $46.6 million. *Id.*

Again, these figures are based on Plaintiffs' assessment of a best-case-scenario. To have obtained such a result at trial(s), Plaintiffs would have had to prove that each Class Member worked off-the-clock for 2 hours in each workweek. *Id.*, ¶ 89. These figures would of course be disputed and hotly contested. *Id*. The result is well within the reasonable standard when considering the difficulty and risks presented by pursuing further litigation. *Id*. The final settlement amount takes into account the substantial

---

[37] *See also Stovall-Gusman v. W.W. Granger, Inc.*, 2015 WL 3776765, at *4 (N.D. Cal. June 17, 2015) ("10% gross and 7.3% net figures are 'within the range of reasonableness'"); *Balderas v. Massage Envy Franchising, LLP*, 2014 WL 3610945, at *5 (N.D. Cal. July 21, 2014) (gross settlement amount of 8% of maximum recovery and net settlement amount of 5%); *Ma v. Covidien Holding, Inc.*, 2014 WL 360196, at *4-5 (C.D. Cal. Jan. 31, 2014) (9.1% of "the total value of the action" is within the range of reasonableness).

risks inherent in any class action wage-and hour case, as well as the procedural posture of the Lawsuit and the unique factual and legal issues in this case. Cottrell Decl., ¶ 90; *see Officers for Justice*, 688 F.2d at 623.

### 2. The Parties have agreed to distribute settlement proceeds tailored to the Classes and Collective and their respective claims.

In an effort to ensure fairness, the Parties have agreed to allocate the settlement proceeds amongst Collective and Class Members in a manner that recognizes that amount of time that the particular retail employee worked for Defendant in the applicable limitations period. The allocation method, which is based on the number of workweeks, will ensure that longer-tenured workers receive a greater recovery. Moreover, the broader allocation of the Net Settlement Amount tracks the differences in substantive law and penalty claims. Cottrell Decl., ¶ 91. The allocation was made based on Class Counsel's assessment to ensure that employees are compensated accordingly and in the most equitable manner. *Id.*

A class action settlement need not benefit all class members equally. *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1148 (11th Cir. 1983); *In re AT & T Mobility Wireless Data Services Sales Tax Litigation,* 789 F.Supp.2d 935, 979–80, 2011 WL 2204584 at *42 (N.D. Ill. 2011). Rather, although disparities in the treatment of class and collective members may raise an inference of unfairness and/or inadequate representation, this inference can be rebutted by showing that the unequal allocations are based on legitimate considerations. *Holmes,* 706 F.2d at 1148; *In re AT & T,* 789 F.Supp.2d at 979–80, 2011 WL 2204584 at *42. Plaintiffs provide rational and legitimate bases for the allocation method here, and the Parties submit that it should be approved by the Court.

### 3. The extensive discovery enabled the Parties to make informed decisions regarding settlement.

The amount of discovery completed prior to reaching a settlement is important because it bears on whether the Parties and the Court have sufficient information before them to assess the merits of the claims. *See, e.g.*, *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 617, 625 (N.D. Cal. 1979); *Lewis v. Starbucks Corp.*, No. 2:07-cv-00490-MCE-

28

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

DAD, 2008 WL 4196690, at *6 (E.D. Cal. Sept. 11, 2008). Informal discovery may also assist parties with "form[ing] a clear view of the strengths and weaknesses of their cases." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, 454 (E.D. Cal. 2013).

Here, the Parties engaged in extensive formal and informal discovery and class outreach that have enabled both sides to assess the claims and potential defenses in this action. Cottrell Decl., ¶¶ 25-39, 92. The Parties were able to accurately assess the legal and factual issues that would arise if the case proceeded to trial. *Id.*, ¶ 92. In addition, in reaching this Settlement, Plaintiffs' counsel relied on their substantial litigation experience in similar wage and hour class and collective actions. Cottrell Decl., ¶¶ 6-8, 93; Shavitz Decl., ¶¶ 4-13. Plaintiffs' counsel's liability and damages evaluation was premised on a careful and extensive analysis of the effects of Defendant's compensation policies and practices on Class Members' pay. Cottrell Decl., ¶ 85. Ultimately, facilitated by mediator Jeff Ross, the Parties used this information and discovery to fairly resolve the litigation. *Id.*, ¶ 95.

### 4. Litigating the Lawsuit not only would delay recovery, but would be expensive, time consuming, and involve substantial risk.

The monetary value of the proposed Settlement represents a fair compromise given the risks and uncertainties posed by continued litigation. *Id.*, ¶ 96. If the Lawsuit were to go to trial as a class and collective action (which Defendant would vigorously oppose if this Settlement Agreement were not approved), Class Counsel estimates that fees and costs would exceed $6,000,000.00. *Id.*, ¶ 97. Litigating the class and collective action claims would require substantial additional preparation and discovery. *Id.* It would require depositions of experts, the presentation of percipient and expert witnesses at trial, as well as the consideration, preparation, and presentation of voluminous documentary evidence and the preparation and analysis of expert reports. *Id.*

Recovery of the damages and penalties previously referenced would also require complete certification and ultimate success on all of Plaintiffs' claims, a questionable feat in light of developments in wage and hour and class and collective action law as

well as the legal and factual grounds that Defendant has asserted to defend this action. *Id.,* ¶ 98. Off-the-clock claims are difficult to certify for class treatment, given that the nature, cause, and amount of the off-the-clock work may vary based on the individualized circumstances of the worker. *See, e.g., In re AutoZone, Inc., Wage & Hour Employment Practices Litig.*, 289 F.R.D. 526, 539 (N.D. Cal. 2012), aff'd, No. 17-17533, 2019 WL 4898684 (9th Cir. Oct. 4, 2019); *Kilbourne v. Coca-Cola Co.*, No. 14CV984-MMA BGS, 2015 WL 5117080, at *14 (S.D. Cal. July 29, 2015); *York v. Starbucks Corp.*, No. CV 08-07919 GAF PJWX, 2011 WL 8199987, at *30 (C.D. Cal. Nov. 23, 2011). While Plaintiffs are confident that they would establish that common policies and practices give rise to the off-the-clock work for retail employees, Plaintiffs acknowledged that the work was performed at hundreds of different locations around the country, under hundreds of differing supervisors and managers. Cottrell Decl., ¶ 99. With localized practices, the sales volume of the store, the physical layout, and the nature of the work varying by location, Plaintiffs recognized that obtaining class certification would present a significant obstacle, with the risk that the retail employees could only pursue individual actions in the event that certification was denied.

Certification of off-the-clock work claims is complicated by the lack of documentary evidence and heavy reliance on employee testimony, and Plaintiffs would likely face motions for decertification as the case progressed. *Id.,* ¶ 100. Moreover, Defendant maintained facially compliant policies, and required workers to complete frequent acknowledgements that the hours that they entered in Sprint's timekeeping system were true and correct. *Id.* Given that the substantive damages are largely driven by the alleged off-the-clock work, and that derivative and penalty claims are tethered to off-the-clock claims, Plaintiffs' counsel was required to significantly discount the hypothetical value of the claims when assessing the mediator's proposal for Settlement. *Id.*

Assuming that Plaintiffs prevailed on class certification, they would still confront challenges in establishing liability and proving up damages amounts. *Id.,* ¶ 101. Plaintiffs acknowledged that their theory of off-the-clock work hinged

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

significantly on after-hours communications by retail employees with supervisors and co-workers. *Id.,* ¶ 102. Plaintiffs allege that these communications often took place via group messaging platforms like GroupMe, and also via traditional phone calls and text messages. *See* ECF 1, 45-1. However, through the outreach process and reviewing documentary evidence, Plaintiffs' counsel saw indications that some of these communications were arguably focused on personal development (such as general teambuilding, morale-building, and growth as a salesperson), while others were arguably personal communications among friendly co-workers. Cottrell Decl., ¶ 102. Sprint would contend that this time is voluntary and/or geared towards "personal development" and is therefore not compensable under the FLSA. *See* 29 CFR § 785.27.

Assuming Plaintiffs prevailed on the merits, they would still face fundamental issues of proving damages. Establishing the amounts of violations would be very dependent on employee testimony, as the amounts of alleged off-the-clock work, whether on-site or off-site, were not recorded. With respect to after-hours communications, work-related communications via decentralized platforms such as text messages and GroupMe are scattered across varying systems and accounts. Cottrell Decl., ¶ 104. For example, each Sprint store could create a GroupMe group in the same way a group of friends can create a group communication structure on Facebook or Google. Involvement and/or coordination from the Sprint corporate level did not necessarily occur, and these communications may not have been archived in any central repository. *Id*. Moreover, retail employees typically retain very few (if any) of these communications in their possession, due to acquiring new cellular devices, closing out accounts, and general attrition of data over time. *Id*. As Plaintiffs may face difficulty obtaining evidence of these communications and other tasks performed, proving up amounts of alleged off-the-clock work poses significant risks. *Id*.

In contrast to litigating this suit, resolving this case by means of the Settlement will yield a prompt, certain, and very substantial recovery for the Class Members. Cottrell Decl., ¶ 93. Such a result will benefit the Parties and the court system. *Id*. It will bring finality to two years of arduous litigation, and will foreclose the possibility

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

of expanding litigation.

### 5. The Settlement is the product of informed, non-collusive, and arm's-length negotiations between experienced counsel.

Courts routinely presume a settlement is fair where it is reached through arm's-length bargaining. *See Hanlon*, 150 F.3d at 1027; *Wren*, 2011 WL 1230826, at *14. Furthermore, where counsel are well-qualified to represent the proposed class and collective in a settlement based on their extensive class and collective action experience and familiarity with the strengths and weaknesses of the action, courts find this factor to support a finding of fairness. *Wren*, 2011 WL 1230826, at *10; *Carter v. Anderson Merchandisers, LP*, No. EDCV 08-0025-VAP OPX, 2010 WL 1946784, at *8 (C.D. Cal. May 11, 2010) ("Counsel's opinion is accorded considerable weight.").

Here, the settlement was a product of non-collusive, arm's-length negotiations. Cottrell Decl., ¶ 107. The Parties participated in an MSC and a full mediation. The session with Jeff Ross, who is a highly skilled mediator with many years of experience mediating employment matters, was a lengthy session that lasted well into the night. *Id.* The Parties then spent several months negotiating the long-form settlement agreement, with numerous rounds of meet and confer and correspondence related to the terms and details of the Settlement. *Id.*, ¶ 107. Plaintiffs are represented by experienced and respected litigators of representative wage and hour actions, and these attorneys feel strongly that the proposed Settlement achieves an excellent result for the Class Members. *Id.*, ¶ 108; Shavitz Decl., ¶ 17.

### D. The Class Representative Enhancement Payments are Reasonable.

Named plaintiffs in class action litigation are eligible for reasonable service awards. *See Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003).[38] The enhancement payments of up to $15,000 for Plaintiff Amaraut and up to $10,000 for Plaintiffs Almonte, Fox, McCollum, Myers, and Painter are intended to compensate

---

[38] "Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 300 (N.D. Cal. 1995) (named plaintiff received $50,000 for work in class action).

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

Plaintiffs for the critical role they played in this case, and the time, effort, and risks undertaken in helping secure the result obtained on behalf of the Class Members.[39] Cottrell Decl., ¶ 109. In agreeing to serve as Class and Collective representatives, Plaintiffs formally agreed to accept the responsibilities of representing the interests of all Class Members. *Id., ¶* 111. Defendant does not oppose the requested payments to Plaintiffs as reasonable service awards. *Id., ¶* 112.

Moreover, the service awards are fair when compared to the payments approved in similar cases. *See, e.g.*, *De Orozco v. Flagship Facility Servs.*, No. 18-CV-2397 JLS (JLB), 2020 U.S. Dist. LEXIS 238733, at \*23 (S.D. Cal. Dec. 18, 2020) (approving $10,000 service award in recent wage and hour action); *Hose v. Wash. Inventory Serv.*, No. 14-cv-2869-WQH-AGS, 2020 U.S. Dist. LEXIS 117242, at \*54 (S.D. Cal. July 2, 2020) (Hayes, J., approving $20,000 service award in wage and hour action); *Soto, et al. v. O.C. Communications, Inc., et al.*, Case No. 3:17-cv-00251-VC, ECF 304 (N.D. Cal. Oct. 23, 2019) (approving $15,000 and $10,000 service awards in hybrid FLSA/Rule 23 settlement); *Guilbaud v. Sprint/United Management Co., Inc.,* No. 3:13-cv-04357-VC, Dkt. No. 181 (N.D. Cal. Apr. 15, 2016) (approving $10,000 service payments for each class representative in FLSA and California state law representative wage and hour action); *Van Liew v. North Star Emergency Services, Inc., et al.*, No. RG17876878 (Alameda Cty. Super. Ct., Dec. 11, 2018) (approving $15,000 and $10,000 service awards, respectively, to class representatives in California Labor Code wage and hour class action).

### E. The Requested Attorneys' Fees and Costs are Reasonable.

In their fee motion to be submitted with the final approval papers, Plaintiffs' counsel will request up to 33.33% of the Maximum Gross Settlement Amount, or $2,533,080, plus reimbursement of costs up $120,000. Cottrell Decl., ¶ 113. Plaintiffs' counsel will provide the lodestar information for Schneider Wallace Cottrell Konecky LLP and Shavitz Law Group, P.A. with their fee motion, and anticipate that the

---

[39] Moreover, Plaintiffs have agreed to a general release, unlike other Class Members. *See* Settlement Agreement, ¶ II.14.

aggregate lodestar will be approximately on par with the requested fee award. *Id*. On this basis, the requested attorneys' fees award is reasonable. *Id*.; *see, e.g., Vizcaino v. Microsoft Corp.*, 290 F. 3d 1043, 1050-51 (9th Cir. 2002) ("Calculation of the lodestar, which measures the lawyers' investment of time in the litigation, provides a check on the reasonableness of the percentage award").

The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark. *Vasquez v. Coast Valley Roofing*, 266 F.R.D. 482, 491-492 (E.D. Cal. 2010) (citing *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000)); *Hanlon*, 150 F.3d at 1029; *Staton*, 327 F.3d at 952. However, the exact percentage varies depending on the facts of the case, and in "most common fund cases, the award exceeds that benchmark." *Id*. (citing *Knight v. Red Door Salons, Inc.*, 2009 WL 248367 (N.D. Cal. 2009); *In re Activision Sec. Litig.*, 723 F.Supp. 1373, 1377-78 (N.D. Cal. 1989) ("nearly all common fund awards range around 30%")). In California, federal and state courts have customarily approved payments of attorneys' fees amounting to one-third of the common fund in comparable wage and hour class actions. *See, e.g., Soto, et al. v. O.C. Communications, Inc., et al.*, Case No. 3:17-cv-00251-VC, ECF 304 (N.D. Cal. Oct. 23, 2019) (approving attorneys' fees of one-third of the gross settlement in recent hybrid FLSA/Rule 23 settlement); *Regino Primitivo Gomez, et al. v. H&R Gunlund Ranches, Inc.*, No. CV F 10–1163 LJO MJS, 2011 WL 5884224 (E.D. Cal. 2011) (approving attorneys' fees award equal to 45% of the settlement fund); *Wren*, 2011 WL 1230826 (approving attorneys' fee award of just under 42% of common fund).

In this case, given the excellent results achieved, the effort expended in litigating the Lawsuit, which was aggressively and bitterly contested at every phase, and the difficulties attendant to litigating this case, such an upward adjustment is warranted. Cottrell Decl., ¶ 102. There was no guarantee of compensation or reimbursement. *Id*. Rather, counsel undertook all the risks of this litigation on a completely contingent fee basis. *Id*. These risks were front and center. *Id*. Defendant's vigorous and skillful defense further confronted Plaintiffs' counsel with the prospect

of recovering nothing or close to nothing for their commitment to and investment in the case. *Id.*

Nevertheless, Plaintiffs and their counsel committed themselves to developing and pressing Plaintiffs' legal claims to enforce the employees' rights and maximize the class and collective recovery. *Id., ¶ 115.* During the litigation, counsel had to turn away other less risky cases to remain sufficiently resourced for this one. *Id.* The challenges that Class Counsel had to confront and the risks they had to fully absorb on behalf of the class and collective here are precisely the reasons for multipliers in contingency fee cases. *See, e.g.*, *Noyes v. Kelly Servs., Inc.*, 2:02-CV-2685-GEB-CMK, 2008 WL 3154681 (E.D. Cal. Aug. 4, 2008); Posner, Economic Analysis of the Law, 534, 567 (4th ed. 1992) ("A contingent fee must be higher than a fee for the same legal services paid as they are performed… because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans").

Attorneys who litigate on a wholly or partially contingent basis expect to receive significantly higher effective hourly rates in cases where compensation is contingent on success, particularly in hard-fought cases where, like in the case at bar, the result is uncertain. This does not result in any windfall or undue bonus. In the legal marketplace, a lawyer who assumes a significant financial risk on behalf of a client rightfully expects that his or her compensation will be significantly greater than if no risk was involved (*i.e.,* if the client paid the bill on a monthly basis), and that the greater the risk, the greater the "enhancement." Adjusting court-awarded fees upward in contingent fee cases to reflect the risk of recovering no compensation whatsoever for hundreds of hours of labor simply makes those fee awards consistent with the legal marketplace, and in so doing, helps to ensure that meritorious cases will be brought to enforce important public interest policies and that clients who have meritorious claims will be better able to obtain qualified counsel.

For these reasons, Plaintiffs' counsel respectfully submits that a 33.33% recovery for fees is appropriate. *Id., ¶ 117.* Class Counsel also requests reimbursement

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

1   for their litigation costs. *Id.* Class Counsel's efforts resulted in an excellent settlement,

2   and the fee and costs award should be preliminarily approved as fair and reasonable.

3   **F. The Proposed Notices of Settlement and Claims Process Are Reasonable.**

4   The Court must ensure that Class Members receive the best notice practicable

5   under the circumstances of the case. *See Phillips Petroleum Co. v. Shutts*, 472 U.S.

6   797, 811-12 (1985); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174-75 (1974).

7   Procedural due process does not guarantee any particular procedure but rather requires

8   only notice reasonably calculated "to apprise interested parties of the pendency of the

9   action and afford them an opportunity to present their objections." *Mullane v. Cent.*

10   *Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Silber v. Mabon*, 18 F.3d 1449,

11   1454 (9th Cir. 1994). A settlement notice "is satisfactory if it 'generally describes the

12   terms of the settlement in sufficient detail to alert those with adverse viewpoints to

13   investigate and to come forward and be heard.'" *Churchill Village LLC*, 361 F.3d at

14   575.

15   The Notices of Settlement, attached as **Exhibit A-C** to the Settlement

16   Agreement, and manner of distribution negotiated and agreed upon by the Parties are

17   "the best notice practicable." Cottrell Decl., ¶ 118; Fed.R.Civ.P. 23(c)(2)(B). The

18   Notices of Settlement will be mailed directly to each Class Member, and e-mailed to

19   those for whom Sprint has a personal email address. Cottrell Decl., ¶ 119. The proposed

20   Notices are clear and straightforward, and provide information on the nature of the

21   Lawsuit and the proposed Classes and Collective, the terms and provisions of the

22   Settlement Agreement, and the monetary awards. *Id.* In addition, the Parties will

23   provide a settlement website that provides a generic form of the Notice, the Settlement

24   Agreement, and other case related documents and contact information. *Id.*, ¶ 120.

25   The proposed Notices fulfill the requirement of neutrality in class notices.

26   Cottrell Decl., ¶ 121. *See* Conte, Newberg on Class Actions, § 8.39 (3rd Ed. 1992).

27   They summarize the proceedings necessary to provide context for the Settlement

28   Agreement and summarize the terms and conditions of the Settlement, including an

explanation of how the settlement amount will be allocated between the Named

Plaintiffs, Plaintiffs' counsel, the Settlement Administrator, and the Class Members, in an informative, coherent and easy-to-understand manner, all in compliance with the Manual for Complex Litigation's recommendation that "the notice contain a clear, accurate description of the terms of the settlement." Cottrell Decl., ¶ 109; Manual for Complex Litigation, Settlement Notice, § 21.312 (4th ed. 2004).

The Class and Class/Collective Notices clearly explain the procedures and deadlines for requesting exclusion from the Settlement, objecting to the Settlement, the consequences of taking or foregoing the various options available to Class Members, and the date, time and place of the Final Approval Hearing. Cottrell Decl., ¶ 122. Pursuant to Rule 23(h), the proposed Notices of Settlement also sets forth the amount of attorneys' fees and costs sought by Plaintiffs, as well as an explanation of the procedure by which Class Counsel will apply for them. *Id.* The Notices of Settlement clearly state that the Settlement does not constitute an admission of liability by Defendant. *Id.* The Notices makes clear that the final settlement approval decision has yet to be made. *Id.,* ¶ 123. Accordingly, the Notices of Settlement comply with the standards of fairness, completeness, and neutrality required of a settlement class notice disseminated under authority of the Court. *See* Conte, Newberg on Class Actions, §§ 8.21 and 8.39 (3rd Ed. 1992); Manual for Complex Litigation, Certification Notice, § 21.311; Settlement Notice, § 21.312 (4th ed. 2004).

Furthermore, reasonable steps will be taken to ensure that all Putative Class Members receive the Notice. Cottrell Decl., ¶ 125. Before mailing, and pursuant to the terms of the Settlement Agreement, Sprint will provide to the Settlement Administrator a database that contains the names, last known addresses, last known personal e-mail addresses, last known phone numbers, and social security numbers of each Putative Class Member, along with the start and end dates of employment for each Putative Class Member, and the agreed-upon information necessary to perform Payout Calculations, including applicable number(s) of workweeks for calculating the respective settlement shares. *Id.* The Notices of Settlement will be sent by United States Mail, and also via e-mail to the maximum extent possible. The Settlement

Administrator will make reasonable efforts to update the contact information in the database using public and private skip tracing methods. *Id.*

With respect to Class Notices returned as undeliverable, the Settlement Administrator will re-mail any Notices returned to the Settlement Administrator with a forwarding address following receipt of the returned mail. *Id., ¶* 126. If any Notice is returned to the Settlement Administrator without a forwarding address, the Settlement Administrator will undertake reasonable efforts to search for the correct address, including skip tracing, and will promptly re-mail the Notice of Settlement to any newly found address. *Id.*

Putative Class Members will have 60 days from the mailing of the Notices of Settlement to opt-out or object to the Settlement. *Id.,* ¶ 127. Any Putative Class Member who does not submit a timely request to exclude themselves from the Settlement will be deemed a Settlement Class Member whose rights and claims are determined by any order the Court enters granting final approval, and any judgment the Court ultimately enters in the case. *Id.* Administration of the Settlement will follow upon the occurrence of the Effective Date of the Settlement. *Id., ¶* 128.

Because the proposed Notices of Settlement clearly and concisely describe the terms of the Settlement and the awards and obligations for Putative Class Members who participate, and because the Notices will be disseminated in a way calculated to provide notice to as many Class Members as possible, the Notices of Settlement should be preliminarily approved.

### G. The Court Should Approve the Proposed Schedule.

The Settlement Agreement contains the following proposed schedule, which Plaintiffs respectfully request this Court approve:

| | |
|---|---|
| Date of preliminary approval of the Settlement as to Classes and approval of the Settlement as to the Collective | |
| Deadline for Sprint to provide Heffler Claims Group with the Class Data List | Within 21 business days after the Court enters an order granting preliminary approval of the Settlement |
| Deadline for Heffler Claims Group to mail the Notice of Settlement to Putative Class | Within 10 calendar days after Heffler Claims Group receives the Class Data |

| Members and Opt-in Plaintiffs | List |
|---|---|
| Deadline for Putative Class Members to postmark requests to opt-out or file objections to the Settlement | 60 calendar days after Notices of Settlement are mailed |
| Deadline for filing of Final Approval Motion | Per Local Rule (at least 28 days before Final Approval Hearing) |
| Deadline for Class Counsel to File a Motion for Approval of the Fee and Cost Award and of the Service Awards to the Class Representatives | Per Local Rule (at least 28 days before Final Approval Hearing) |
| Deadline for Heffler Claims Group to provide a declaration regarding the notice process that includes the number of individuals and workweeks reflected in the data provided by Defendant; the number of mailings; the number of Workweeks Disputes, Objections, and Requests for Exclusion received; and other information as is required to obtain final approval of the Settlement Agreement | At least 10 days before Final Approval Hearing |
| Final Approval Hearing | |
| Effective Date | The date by which all of the following have occurred: (a) the Court has entered an order granting preliminary approval and final approval of the Settlement Agreement; (b) the time for appeal from the Court's Final Approval Order and Judgment has expired (with no appeal having been filed); or (c) in the event any appeal is filed, the date the appeal is disposed in the Parties' favor and is no longer subject to review by any court, whether by appeal, petitions for rehearing or re-argument, petitions for review, or otherwise |
| Deadline for Heffler Claims Group to calculate the employer share of taxes and provide Sprint with the total amount of Sprint's Employer Taxes | Within 7 calendar days after Effective Date |
| Deadline for Sprint to pay the Maximum Gross Settlement Amount and Employer Taxes amount into a qualified settlement account provided by Heffler Claims Group. | Within 30 business days after Effective Date |
| Deadline for Heffler Claims Group to make payments under the Settlement to Collective and Class Members, Named Plaintiffs, Plaintiffs' counsel, and itself | Within 10 business days after the funding of the qualified settlement account |
| Check-cashing deadline | 120 days after issuance |

| Deadline for Plaintiffs and Plaintiffs' counsel to Destroy and/or Return Evidence Pursuant to the Settlement Agreement | Within seven (7) calendar days of the distribution of the settlement funds to the Settlement Administrator |
| --- | --- |
| Deadline for Heffler Claims Group redistribute uncashed check funds or transfer uncashed check funds to *cy pres* recipient | As soon as practicable after check-cashing deadline |
| Deadline for Heffler Claims Group to provide written certification of completion of administration of the Settlement to counsel for all Parties and the Court | As soon as practicable after redistribution and/or *cy pres* payment |

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant preliminary approval of the Settlement Agreement as to the Putative Classes and approval of the Settlement Agreement as to the Collective, in accordance with the schedule set forth herein.

Date: January 8, 2021                        Respectfully submitted,


/s/ *Carolyn Hunt Cottrell*
Carolyn Hunt Cottrell
David C. Leimbach
Scott L. Gordon
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**

/s/ *Gregg I. Shavitz*
Gregg I. Shavitz (*pro hac vice*)
Michael Palitz (*pro hac vice*)
Tamra C. Givens (*pro hac vice*)
**SHAVITZ LAW GROUP, P.A.**

Attorneys for Plaintiffs and the Collective and Putative Classes

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT
*Amaraut, et al. v. Sprint/United Management Company*; Case No. 3:19-cv-00411-WQH-AHG

## SIGNATURE ATTESTATION

I hereby attest that all signatories listed above, on whose behalf this joint motion is submitted, concur in the filing's content and have authorized the filing.

Dated: January 8, 2021                                   /s/ *Carolyn Hunt Cottrell*
                                                         Carolyn Hunt Cottrell

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for the United States District Court, Southern District of California, by using the Court's CM/ECF system on January 8, 2021.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF system.

Dated: January 8, 2021                                   /s/ *Carolyn Hunt Cottrell*
                                                         Carolyn Hunt Cottrell